Richard WILLIAMS, Plaintiff,

v.

Marvin T. RUNYON, Postmaster General, Defendant.

No. 93 C 2941.

United States District Court,
N.D. Illinois,
Eastern Division.

April 4, 1995.

Gerald A. Goldman and Arthur R. Ehrlich, Goldman & Marcus, Chicago, IL, for plaintiff.

James Michael Kuhn, U.S. Attorney's Office, Chicago, IL, for defendant.

## OPINION AND ORDER

NORGLE, District Judge:

This matter having been tried before the court between February 3 and February 10, 1995, and after hearing the evidence and arguments at trial, the court enters the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. For reasons set forth below, judgment is entered in favor of Defendant and against Plaintiff as to all counts of the Complaint.

## FINDINGS OF FACT

1. The court conducted a bench trial on all counts of Plaintiff's Complaint.

2. Plaintiff's Complaint contains allegations of sexual harassment, sex discrimination, age discrimination, and unlawful termination as reprisal for filing a complaint with the Equal Employment Opportunity Commission ("EEOC") in violation of Title VII and the Age Discrimination in Employment Act ("ADEA").

3. Plaintiff brought this suit against the Defendant Marvin T. Runyon, Postmaster General of the United States Postal Service ("Defendant Postal Service").

4. Plaintiff Richard Williams ("Williams") is an African–American male. He is forty years of age.

5. Plaintiff is a citizen of the United States and a resident of the City of Chicago, Cook County, Illinois.

6. Plaintiff began employment with the Postal Service on May 6, 1958, and remained a Postal Service employee until his termination on June 24, 1987. Plaintiff had several breaks in service during employment with the Postal Service.

7. Williams' suit is based on the following grounds: (1) that Clora Grant ("Grant")[1] had sexually harassed him for approximately two years prior to his termination; and (2) that the events which the Postal Service claims gave rise to his termination were simply a pretext for terminating him due to his age, sex, and his filing of complaints with the EEOC.

8. Grant, the afternoon supervisor, came near Williams two or three times a day. She did this as Williams sorted the mail in his cubicle—his cubicle, located in a busy area, was one of a number of cubicles in a row where others sorted the mail. Each time Grant came near Williams, she would stand close enough that Williams could feel her breath on his face. Grant also stood close enough that her hips and thighs would touch Williams' body. The uninvited touching of hips and thighs occurred several times over a period of time.

9. On three separate occasions, Grant asked Williams if he could come over to her apartment to fix an electrical appliance and an electrical outlet, and for a "good old country girl's meal."

10. Williams declined the invitations on each occasion.

11. Grant also touched Williams on several occasions. On one occasion, Grant reached into Williams' shirt pocket and pinched his

---

1. Grant was unable to testify due to a severe medical condition. On September 6, 1992, Grant suffered a cranial aneurysm, which left her incapacitated and unable to testify at trial. (Defendant's Exhibit # 4.) The court notes that since Grant could not testify, Plaintiff's allegations of sexual harassment could not be rebutted successfully. Thus, because there was no sufficient rebuttal, the court takes Plaintiff's statements as true.

nipple while purportedly looking for cigarettes. On another occasion, Grant reached into the front pocket of Williams' pants.

12. Williams repeatedly spurned Grant's advances.

13. Grant began to criticize Williams and placed "test letters" on his route more frequently than with other employees.

14. Williams made several complaints with Lee Baker ("Baker"), the morning supervisor, Sadie Boles ("Boles"), the Station Superintendent for the Pilsen Station, and O.V. Washington ("Washington"), another postal supervisor.

15. Williams' wife also complained of the alleged harassment to Washington about Grant's activities. She learned of these allegations from her spouse.

16. Defendant Postal Service disregarded the complaints and made no attempts to remedy the situation or to counsel Grant on the effects of her actions.

17. As a result of the Grant's alleged actions, Williams developed stomach pains and insomnia.

18. On August 20, 1986, fourteen Postal Service employees were killed and others wounded by a fellow Postal Service employee in Edmond, Oklahoma. This incident was widely publicized within the Postal Service and by the American media.

19. On the morning of Saturday, August 23, 1986, three days after the murders in Oklahoma, Baker, a morning supervisor, criticized Williams for being absent from his work station for thirty minutes.

20. Williams denied he had been gone for thirty minutes. Williams claimed he was in the bathroom no longer than ten minutes and argued that the unusual weight of his mail bag caused the extra twenty minute delay. Williams disputed the allegations, although based upon the personal observations of Baker.

21. Due to the extended absence from his work station and the resultant insubordination, Baker planned to take disciplinary action against Williams.

22. Upon returning from his delivery route, Williams confronted Grant and asked her about Baker's earlier criticisms.

23. Grant attempted to explain the reasons Williams was reprimanded.

24. Williams began to curse loudly and make threatening remarks about the supervisors. Numerous employees were in the immediate area.

25. Williams admitted at trial that he told Grant that he understood why the Postal Service employee in Oklahoma killed fourteen other employees. Williams then stated to Grant, "I need to do something to you son-of-a-bitches." (Defendant's Exhibit # 5.)

26. The evidence demonstrates that this confrontation left Grant fearful for her physical safety (Defendant's Exhibits # 2, # 5), and led her to contact Boles at home.

27. Grant usually handled work-place situations on her own, and this contact with Boles at her residence was highly unusual.

28. Pursuant to new Postal Service procedures, Boles directed Grant to lock the doors of the station, notify the police and postal inspectors, and to prepare an emergency suspension of Williams.

29. This new procedure was the direct result of the Oklahoma murders.

30. Grant prepared the Notice of Emergency Suspension on August 23, 1986. Williams was suspended because his "loud, offensive, and profane conduct was 'in direct violation of a Carrier's duties and responsibilities according to Chapter One, 112.2.25 of the Carriers' Handbook.'" (Defendant's Exhibit # 1.)

31. Williams was ultimately terminated on August 27, 1986, due to the events that took place on August 23, 1986, as well as a past history of insubordination. (Defendant's Exhibit # 2.)

32. Williams' employment history reveals that between 1961 and 1980, he had received three 14–day suspensions, a 10–day suspension, a 7–day suspension, and a 5–day suspension. (Defendant's Exhibit # 6.) The suspensions were for failure to report for duty, absence without leave, failure to account for mail, and failure to pay just debts.

33. From 1960 to 1977, Williams received at least thirteen letters of warning. (Defendant's Exhibit # 6.)· The warnings were for absence without permission, failure to deliver mail, chronic tardiness, failure to follow instructions, and failure to safeguard mail.

34. After he was terminated, Williams, through his membership in the National Association of Letter Carriers, filed a grievance dispute pursuant to the collective bargaining agreement. (Defendant's Exhibit # 3.)

35. An arbitrator held hearings and concluded that the termination of Williams was justified. (Defendant's Exhibit # 3.)

36. Upon the unfavorable decision by the arbitrator, Williams filed a complaint with the EEOC and, subsequently, filed this lawsuit.

### CONCLUSIONS OF LAW

1. This court has jurisdiction pursuant to 28 U.S.C. § 1331.

2. Venue in this district is proper under 28 U.S.C. § 1391(b).

3. Williams has failed to meet his burden of proving by a preponderance of the evidence that his termination was due to his age or sex.

4. Further, Williams failed to prove that he was sexually harassed as defined by the hostile work environment theory or that the termination was in retaliation for the complaints lodged with the EEOC.

5. With regard to the alleged violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, Williams did not meet the initial burden required by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

6. Williams failed to satisfy all of the elements of the *prima facie* case necessary to create a rebuttable presumption of age discrimination. *See Weiss v. Coca–Cola Bottling Co.*, 990 F.2d 333, 336 (7th Cir.1993).

7. To establish a *prima facie* case of discriminatory discharge, a plaintiff must demonstrate that "(1) he was a member of the protected class (persons over forty), (2) he was performing his job well enough to meet his employer's legitimate expectations, (3) he was discharged, and (4) the employer sought a replacement for him." *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1039 (7th Cir. 1993). However, the fourth element may also be satisfied by establishing that younger employees were treated more favorably than the plaintiff based on age. *Smith v. Gen. Scanning, Inc.*, 876 F.2d 1315, 1318 (7th Cir.1989).

8. The court finds that Williams failed to demonstrate the second element, that he was performing his job well enough to meet the employer's legitimate expectations. Williams was insubordinate to his supervisors, as evidenced by the great number of suspensions and warnings as well as the events that took place on August 23, 1986.

9. The court further finds that Williams failed to demonstrate the fourth element, that the employer sought a replacement for him or that younger employees were treated more favorable based on age.

10. Even if Williams had satisfied the *prima facie* elements, he has failed to disprove the employer's legitimate, nondiscriminatory reason for terminating him.

11. Defendant Postal Service produced evidence that it terminated Williams due to his chronic insubordination as well as the events of August 26, 1993.

12. Therefore, Defendant Postal Service met its burden of production necessary to rebut any inference of discrimination. *Oxman v. WLS–TV*, 12 F.3d 652, 657 (7th Cir. 1993).

13. Therefore, Williams bears the burden of establishing that Defendant Postal Service's proffered reasons are pretextual. *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir.1994).

14. To establish that the employer's reasons for the termination is a pretext for discrimination, "[i]t is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. . . . [rather] he must show that the explanation is 'a phony reason.'" *Id.*

15. However, the court finds that there is no evidence at all to support Williams's claim

that the employer's proffered reasons are "phony."

16. Since Williams did not convince the trier of fact that it is more likely than not that the employer did not act for its proffered reasons, the employer's decision remains unresolved and the inferences from the *prima facie* case are successfully dissolved. *Oxman v. WLS–TV*, 12 F.3d 652, 657 (7th Cir.1993).

17. Therefore, since Williams produced no evidence to support his claim that Defendant Postal Service terminated him due to his age, the court finds for Defendant Postal Service with regard to Count IV.

18. With regard to Count II, Williams also failed to satisfy the elements of a *prima facie* case of termination based on sex as required by *McDonnell Douglas*, 411 U.S. at 792, 93 S.Ct. at 1819–20.

19. For the same reasons as above, Williams failed to show both that his performance met the employer's legitimate expectations, the second element, and that someone of another sex filled his position, the fourth element of the *prima facie* case.

20. Moreover, even if Williams did meet the *prima facie* case, which he did not, he failed to show that the employer's reasons for terminating him were pretextual. As previously discussed, the only evidence in the record shows that Williams was fired due to the events on August 23, 1986, as well as a history of insubordination.

21. Williams simply produced no evidence to support his claim that Defendant Postal Service terminated him due to his sex. As a result, the court finds for Defendant Postal Service with regard to Count II.

22. With regard to Counts III and V, in which Williams alleges that he was terminated in retaliation for the filing of EEOC complaints, the record is devoid of evidence of retaliation.

23. Specifically, Williams failed to establish a *prima facie* case of retaliation in either count.

24. To establish a *prima facie* case of retaliation under Title VII and the ADEA,

a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action subsequent to the protected activity; and (3) there is a causal link between the protected expression and the adverse action. *Koelsch v. Beltone Elec. Corp.*, 46 F.3d 705, 708–09 (7th Cir.1995); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1313 (7th Cir.1989).

25. Although the first two elements are satisfied, Williams failed to establish a causal relationship between the filing of the EEOC complaint and the termination. The adverse action, the termination of Williams, was not related to the alleged protected expression, the filing of the EEOC complaints. Rather, the termination was solely due to Williams' prior history of insubordination as well as the events of August 23, 1986.

26. Thus, the court finds for Defendant Postal Service with regard to Count III and V.

27. With regard to Count I, the court finds that the actions of Grant, although improper, did not rise to a level of sexual harassment.

28. To prevail under a hostile environment theory, the evidence must show that the employer "permitted unwanted sexual advances that create an offensive [and] hostile working environment." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994).

29. "Concrete psychological harm is not a necessary predicate to maintain a cause of action [for sexual harassment]." *Harris v. Forklift Systems, Inc.*, —— U.S. ——, —— ——, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993).

30. The alleged harassing conduct is to be judged by both an objective and subjective standard. *R.R. Donnelley*, 42 F.3d at 444. In other words, for conduct to rise to the level of unlawful sexual harassment, a reasonable person, as well as Williams himself, must perceive the alleged harassing conduct as an alteration of the conditions of the employment so as to create a hostile work environment. *Meritor Sav. Bank, FSB v.*

**364**

*Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986).

31. "Title VII is not directed against unpleasantness *per se,* but only against discrimination in the conditions of employment." *Koelsch v. Beltone Elec. Corp.,* 46 F.3d 705, 707–08 (7th Cir.1995) (citing *Carr v. Allison Gas Turbine Div. Gen. Motors Corp.,* 32 F.3d 1007, 1009 (7th Cir.1994)).

 32. The court finds that a reasonable person may find the actions of Grant unpleasant, but such a reasonable person would not perceive the actions as "sufficiently severe or pervasive as to alter the conditions of employment and create an abusive work environment." *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405.

33. The court further finds that although Williams "may have found [his] employment environment unpleasant," Williams' demeanor at trial demonstrates that he did not find it offensive and he certainly did not find it was hostile as defined by the statute.

34. Grant's conduct was simply not so severe or pervasive as to render Williams's work environment "hostile."

35. The Seventh Circuit has previously found similar acts as not rising to the level of a hostile environment. *See, e.g., Koelsch,* 46 F.3d 705 (finding that a male co-workers' conduct consisting of rubbing his foot against a plaintiff's leg, grabbing plaintiff's buttocks, asking plaintiff to accompany him for drinks or dinner on several occasions, and telling sexually suggestive and derogatory jokes in the presence of the plaintiff was not tantamount to sexual harassment under the hostile work environment theory); *Weiss v. Coca–Cola Bottling Co.,* 990 F.2d 333, 337 (7th Cir.1993) (holding that incidents of non-consensual touching, attempts to kiss the plaintiff, distributing "I love you" signs around the plaintiff's work area, and asking the female co-worker out on dates was not so severe and pervasive as to create liability for sexual harassment).

36. Thus, the court finds for Williams with regard to Count I.

*CONCLUSION*

For the foregoing reasons, judgment is entered in favor of Defendant Marvin T. Runyon, Postmaster General of the United States, and against Plaintiff Richard Williams as to all counts.

IT IS SO ORDERED.